***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen, and the briefs and arguments of the parties. The parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gillen, with modifications. ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for Defendant-Employer in this claim is Liberty Mutual Insurance Company.
5. Plaintiff sustained an admittedly compensable injury on October 27, 2005, arising out of and in the course and scope of his employment with Defendant-Employer.
6. An employment relationship existed between Plaintiff and Defendant-Employer on October 27, 2005
7. Plaintiff filed a Form 33 Request for Hearing
on December 17, 2009.
8. Subsequent to the hearing before the Deputy Commissioner, the parties stipulated that Plaintiff's average weekly wage as of the date of injury was $501.84, which yields a weekly workers' compensation rate of $334.56.
 ***********
The following were stipulated into evidence as:
 STIPULATED EXHIBITS
1. The Pretrial Agreement, marked as stipulated exhibit 1;
2. A group of documents including medical records, Industrial Commission forms, and discovery information, collectively paginated 1-437 and marked as stipulated exhibit 2; and
3. Documents that include wage information and color photographs, collectively paginated 1-21 and marked as stipulated exhibit 3.
 *********** *Page 3 ISSUE PRESENTED
To what additional medical treatment and/or workers' compensation disability benefits is Plaintiff entitled, if any?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is 51 years of age with a date of birth of February 22, 1960. Plaintiff completed the 11th
grade of high school and has not earned a GED. Prior to working for Defendant-Employer, Plaintiff worked in various hosiery and textile mills. Plaintiff mostly worked as a sewing machine mechanic, but he also worked in the dye department and on the line. All of these jobs were physical jobs. The mechanic jobs required Plaintiff to get into awkward positions and required substantial lifting.
2. Plaintiff did not have back problems before he started working for Defendant-Employer.
3. Plaintiff was hired by Defendant-Employer to work as a material handler. Defendant-Employer manufactures mechanical hoists, and Plaintiff's job as a material handler was to pull orders and move boxes weighing from one pound to 130 pounds from one pallet to another. The material handler position is a heavy labor position.
4. On October 22, 2005, Plaintiff injured his back in the course and scope of his employment when he was moving boxes of chain hoists from one pallet to another. As Plaintiff lifted boxes of chain hoists weighing approximately 125 pounds, Plaintiff felt immediate pain in his back and fell to the floor, striking his knees on the floor and twisting his body. Although, Plaintiff's *Page 4 
Form 18 and the stipulations of the parties indicate that Plaintiff's date of injury was on October 27, 2005, the evidence shows that Plaintiff was injured on October 22, 2005.
5. Plaintiff presented to the emergency room at Anson Community Hospital on October 22, 2005. The medical note from that visit indicates that Plaintiff "Injured [low] back Wed at work." Plaintiff was later referred to Pinehurst Surgical Clinic.
6. On April 10, 2006, Plaintiff presented to Dr. Asim Malik with a chief complaint of back pain. Plaintiff reported that he had back pain in October 2005 that had gotten better, but returned on April 9, 2006, after lifting a heavy box at work. Dr. Malik diagnosed Plaintiff with mechanical back pain and referred Plaintiff for an orthopedic evaluation and restricted Plaintiff from heavy lifting.
7. On April 20, 2006, Plaintiff presented to Mr. Kevin Slater, PA-C at Pinehurst Surgical Clinic for an evaluation of low back pain that had lasted approximately six months from an injury he sustained at work while "loading several boxes from a pile." At that visit Plaintiff was diagnosed with low back pain/strain and was treated with conservative measures. Plaintiff returned to Pinehurst Surgical Clinic multiple times for changes in his medication.
8. On October 6, 2006, Plaintiff returned to the emergency room and was released to return to work on October 9, 2006.
9. On December 12, 2006, Plaintiff returned to the Pinehurst Surgical Clinic with a pain level of seven out of ten. Plaintiff complained of leg pain and back pain radiating into his legs and lateral hips along with tingling and numbness in bilateral legs. Mr. Slater recommended a change in NSAID, and renewal of Skelaxin, and for Plaintiff to follow up as needed.
10. On January 22, 2007, Plaintiff presented to Mr. Slater again with back pain at a level eight out of ten, with pain radiating to bilateral legs, buttocks, and bilateral hips. Plaintiff indicated *Page 5 
that his pain was worse and that the Skelaxin and anti-inflammatory was not helping. Mr. Slater noted that Plaintiff worked 10 to 14 hours per day and wanted to discuss more aggressive treatment because conservative measures were not working. Mr. Slater recommended an MRI of the lumbar spine and referred Plaintiff to Dr. Aaron Gootman of First Health for pain management. Mr. Slater noted that Plaintiff could return to work without restrictions on January 29, 2007.
11. On February 7, 2007 Plaintiff underwent an MRI of the lumbar spine without contrast at North Carolina Diagnostic Imaging, which revealed that the alignment of Plaintiff's lumbar vertebral bodies is within expected limits for his age. It also revealed a broad-based shallow disc protrusion at L3-4 causing encroachment upon the ventral subarachnoid space and both neural foramina at L4-L5 in a fairly symmetric fashion, as well as a diffuse disc bulge at L5-S1 causing encroachment upon the subarachnoid space and both neural foramina.
12. On February 19, 2007, Plaintiff returned to Dr. Slater with the same complaints of pain. However, Plaintiff indicated that the pain was worse with bending and in the morning, especially with weather changes. Mr. Slater recommended that Plaintiff begin pain management.
13. On March 7, 2007, Plaintiff presented to Dr. Gootman for a pain management evaluation. On his intake form, Plaintiff noted that he was employed full-time for Defendant-Employer and averaged 50 hours per week. Plaintiff indicated that his job consisted of pulling orders, lifting boxes from one pallet to another. Plaintiff noted that he spent approximately nine hours standing, 30 minutes sitting, and nine hours lifting items that weighed between zero to 120 pounds. Dr. Gootman performed a right L3, 4, and 5 medial branch block.
14. On March 12, 2007, Plaintiff reported to Dr. Gootman that the right medial block performed on March 7, 2007, provided considerable relief on the right side and that he had very minimal discomfort with twisting maneuvers. Plaintiff indicated that his left side remained painful. *Page 6 
Dr. Gootman performed a left lumbar L3, 4, and 5 medial branch block. On April 18, 2007, Dr. Gootman performed a left radiofrequency of L3-L4 and L5 medial branches.
15. On April 24, 2007, Dr. Gootman gave Plaintiff work restrictions of no heavy lifting over 40 pounds until after treatment on May 1, 2007. On May 1, 2007, Dr. Gootman performed a right radiofrequency of L3-L4 and L5 medial branches. Dr. Gootman released Plaintiff to return to work on May 7, 2007.
16. On May 17, 2007, Dr. Gootman noted that Plaintiff had excellent benefit from the right-sided radiofrequency ablation and that Plaintiff reported that his pain level had decreased to approximately three out of ten.
17. On June 14, 2007, Plaintiff presented to Mr. Slater for a follow up appointment for back pain. Mr. Slater assigned to Plaintiff restrictions for two weeks of no carrying greater than 10 pounds with both arms, no lifting greater than 10 pounds with both arms, and no working more than eight hours per day.
18. On July 10, 2007, Plaintiff was seen by Dr. James Taylor with the pain clinic at Richmond Memorial Hospital, upon referral by Mr. Slater. Dr. Taylor recommended a series of epidural steroid injections and allowed Plaintiff to return to work on light duty effective July 11, 2007. The light duty restrictions were in effect for two weeks.
19. Beginning in August 2007, Plaintiff received chiropractic treatment from the Burch Chiropractic Center. Although Plaintiff had good results from this treatment, Plaintiff was last seen by the Burch Chiropractic Center in 2009 because Defendants did not pay for the treatment.
20. Plaintiff was seen again by Mr. Slater on September 5, 2007, September 13, 2007, and October 30, 2007, with complaints of back pain. On October 30, 2007, Mr. Slater noted that Plaintiff could return to work without restrictions on October 31, 2007. *Page 7 
21. On November 7, 2007, Plaintiff was seen by Dr. John Welshofer, upon referral from Dr. Burch with Burch Chiropractic, for a consultation for back pain, bilateral leg pain, and weakness. Dr. Welshofer noted that Plaintiff appeared to have discogenic back pain with reactive sciatica and assigned restrictions of no continuous sitting or standing, no forceful pushing, pulling, gripping, or twisting, no lifting greater than 20 pounds. Dr. Welshofer also noted that Plaintiff could perform light duty with occasional bending and position changes as necessary.
22. On January 3, 2008, Dr. Burch noted that Plaintiff was restricted from operating a Hyster lift and that Plaintiff should return to work under the restrictions assigned by Dr. Welshofer on November 7, 2007. On January 28, 2008, Dr. Burch took Plaintiff out of work through February 4, 2008. On February 29, 2008, Dr. Burch took Plaintiff out of work from February 26, 2008 through March 8, 2008. On March 11, 2008, Dr. Burch restricted Plaintiff from work effective March 10, 2008 through March 17, 2008 and noted that Plaintiff was not able to perform his usual job duties due to his being out of his pain medication.
23. On April 7, 2008, Plaintiff completed a functional capacity evaluation (FCE) upon referral by Dr. Welshofer. The FCE indicated that Plaintiff was functioning in the heavy physical demand level. Plaintiff's efforts were consistent during the evaluation. Plaintiff demonstrated the ability to lift 65 pounds from waist to shoulder, 55 pounds from floor to waist, and 55 pounds from floor to shoulder.
24. Plaintiff was treated at the Pain Management Group of North Carolina, LLC on May 16, 2008 and May 29, 2008. On May 19, 2008, Dr. Burch took Plaintiff out of work from May 19, 2008 through May 21, 2008, and requested that Defendant-Employer adhere to Plaintiff's restrictions.
25. On June 11, 2008, Plaintiff was treated by Ms. Jerri Patterson of the Pain *Page 8 
Management Group of North Carolina, LLC for chronic lower back pain with radiation into both legs to his calves. Ms. Patterson noted that Plaintiff's pain is aggravated by sitting, standing, and lifting, and Plaintiff's pain is alleviated by lying down and with the use of a TENS unit. Plaintiff indicated that he had difficulty sleeping and that he was not able to work. Plaintiff also noted that the pain minimally affected his relationships with family and friends, recreation activities, and emotions. Ms. Patterson noted that Plaintiff's Oswestry Back Disability Index score was 58%, which is indicative of severe disability with pain remaining the main problem in the group, but activities of daily living are affected. Ms. Patterson noted that her impression was chronic low back pain due to disc protrusion at multiple levels with foraminal stenosis and recommended that Plaintiff continue light duty restrictions and that Plaintiff wear a back support.
26. On July 28, 2008, Dr. Burch restricted Plaintiff from work for July 28, 2008. Plaintiff continued to seek treatment with Ms. Patterson for chronic low back pain in August, September, and October of 2008.
27. On October 20, 2008, due to his continued chronic pain, Plaintiff was treated at The Rehab Center by Dr. T. Kern Carlton at the direction of Defendants for an initial physical medicine and rehabilitation evaluation. Plaintiff reported that he was working in a light duty job, but was finding it increasingly difficult. Plaintiff indicated that he was missing six or seven days of work per month and that he was getting progressively worse. Plaintiff also indicated that twisting and turning made his pain worse. Dr. Carlton indicated that he thought Plaintiff's best option was to begin a functional restoration program. While it would not be a cure for Plaintiff's pain, it would hopefully help Plaintiff to become more functional and allow Plaintiff to work on a consistent basis.
28. On November 25, 2008, Plaintiff presented to The Rehab Center for an initial psychological evaluation with Dr. Brian O'Malley. Plaintiff reported a long history of chronic back *Page 9 
pain and that his symptoms had been unresponsive to interventional pain management and medication. Dr. O'Malley documented that Plaintiff was suffering from an adjustment disorder with mixed emotional features secondary to his pain and associated dysfunction and that Plaintiff was an appropriate candidate for a functional restoration program.
29. Plaintiff participated in a functional restoration program at The Rehab Center from December 2, 2008, through January 12, 2009. Plaintiff was paid temporary total disability benefits during this period.
30. On December 24, 2008, Ms. Sabrena Bagby, a vocational case manager with The Rehab Center, noted in Plaintiff's vocational summary and recommendations that Plaintiff had been an active and enthusiastic participant in the vocational activities and that Plaintiff would like to return to work for Defendant-Employer if they had appropriate work available. Plaintiff was aware of several jobs through Defendant-employer that may be within his restrictions. Plaintiff indicated that these jobs were primarily on the assembly line where the gears for the hoists are produced. Ms. Bagby noted that Plaintiff may benefit from the assistance of a vocational case manager if Defendant-Employer did not have work available for Plaintiff. She also noted that Plaintiff was interested in the small parts assembler position as well as other positions.
31. Plaintiff continued to participate in physical therapy at the The Rehab Center. On January 6, 2009, Plaintiff reported increased lumbar pain over the past few days. On January 7, 2009, Plaintiff reported lumbar pain and difficulty lifting 21 pounds. On January 12, 2009, Plaintiff's therapist noted that Plaintiff had verbal, mechanical, and postural indicators of pain during functional lifting activity. Plaintiff's January 14, 2009 functional status report indicates that Plaintiff has the ability to tolerate an eight-hour workday within the abilities shown on the report and should change positions as needed. *Page 10 
32. On February 13, 2009, Plaintiff reported to Dr. Carlton that he had returned to work and was required to do a lot of repetitive bending causing a severe exacerbation and that the repetitive bending and twisting were giving him problems. Dr. Carlton administered an injection of Toradol, refilled Plaintiff's prescription for Darvocet, and advised Plaintiff to avoid repetitive bending and twisting.
33. On May 19, 2009, Plaintiff reported to Dr. Carlton that he was required to do a lot of bending and pulling at work recently which caused his pain to flare up. Dr. Carlton refilled Plaintiff's Lyrica, reviewed the home exercise program, and continued work restrictions of no repetitive bending or twisting.
34. On August 11, 2009, Plaintiff reported another severe exacerbation the previous day and that Defendant-Employer was not following his restrictions at times. Dr. Carlton continued restrictions of no repetitive bending or twisting.
35. On January 7, 2010, Dr. Carlton wrote Plaintiff out of work for two weeks due to back pain and indicated that Plaintiff should continue his restrictions of no bending or twisting. On January 22, 2010, Dr. Carlton completed a certification of healthcare provider for Plaintiff for FMLA indicating that Plaintiff was able to perform light duties. Dr. Carlton recommended a job site evaluation and assigned work restrictions of no twisting or bending and excused Plaintiff from work for another week.
36. On February 11, 2010, a job site analysis was performed at Defendant-Employer's facility for the sub-assembler position. This analysis indicated that Plaintiff was required to regularly stand and frequently walk and that Plaintiff had to frequently move from one workstation to another. It was noted that Plaintiff had to reach forward to gather material to build limit switch frames and that Plaintiff was required to reach upward to pull down the air gun to bolt the limit *Page 11 
switch frame. Plaintiff also had to reach overhead to remove an object weighing approximately six pounds from the moving line hook and had to reach laterally to receive the wire prior to attaching the terminal end when running jumper wires.
37. Plaintiff performed the material handler job as long as he could subsequent to his injury, but eventually Plaintiff was unable to complete the required tasks due to pain. Plaintiff missed days from work due to pain while still in the material handler position subsequent to his injury and was never compensated for those days. Due to his physical limitations, at Plaintiff's request, Plaintiff was eventually transferred to the sub-assembly department. In the sub-assembly department, Plaintiff was paid $12.81 per hour and his ability to get raises was limited. In comparison, Plaintiff's former peer material handlers were moved up to $15.00 per hour and were eligible for further raises.
38. Although Plaintiff believed that the sub-assembler job was within the restrictions that Dr. Carlton assigned him, Plaintiff had difficulty completing the work assigned due to pain. Initially, in the sub-assembler job, Plaintiff was building power cords full-time, but spooling the power cords caused back pain. Defendant-Employer removed Plaintiff from doing that work. As of the date of the hearing before the Deputy Commissioner, Plaintiff was working in the sub-assembly department and was tasked with building limit switches, brakes, and terminal wires, which are all items that are light in weight. The work that Plaintiff was doing in the sub-assembler department required him to do a lot of twisting and bending. In making these items Plaintiff does not have to bend as much because he now has use of a swivel chair. Due to his pain, even with these modifications Plaintiff is only able to work three and a half to four days per week, with limited hours on those days.
39. Defendant-Employer does not have full-time work for Plaintiff's current position. *Page 12 
One employee named "Doll" performs the sub-assembly work full time and has always been employed to do so. The leftover sub-assembly work Plaintiff has been doing has been done in the past by workers from other departments who have had extra time. Furthermore, Plaintiff has missed substantial amounts of time due to his pain condition while working in the sub-assembly job, and Defendant-Employer would likely not accept this absenteeism from another employee. On May 18, 2009, Plaintiff's supervisor noted that Plaintiff's attendance needed immediate attention. Plaintiff was not aware of any full-time jobs with Defendant-Employer that he could do within his restrictions because they all required bending and twisting.
40. Dr. John Welshofer restricted Plaintiff from continuous sitting or standing, forceful pushing, pulling, gripping, twisting, and lifting greater than 20 pounds. Dr. Welshofer indicated that Plaintiff could engage in occasional bending and position changes as necessary. Dr. Welshofer did not believe that Plaintiff had a good surgical outlook and stated that his restrictions were in place to help protect Plaintiff's back. Dr. Welshofer testified that Plaintiff will always continue to hurt some.
41. Dr. Welshofer opined that if Plaintiff had to leave work due to pain, such that he is only working three and half to four days per week, then Plaintiff needs a different job.
42. Dr. Welshofer testified that although Plaintiff's FCE indicates that Plaintiff should be able to perform the sub-assembler job, the FCE is a three-hour period and is not representative of a full eight-hour workday. While Dr. Welshofer felt that the description of the work that Plaintiff was performing for Defendant-Employer was reasonable for him to do given his condition, if Plaintiff felt he could not do it, then Dr. Welshofer felt Plaintiff should find another job. *Page 13 
43. According to Dr. Welshofer, Plaintiff will need intermittent treatment for back pain for the rest of his life.
44. Dr. Carlton opined that Plaintiff would have ongoing pain and ongoing incapacity as a result of his back injury. Dr. Carlton indicated that Plaintiff's pain generator was an aggravation of his multilevel degenerative disease, not withstanding the modifications made by Defendant-Employer. Dr. Carlton opined that it would be difficult for Plaintiff without a GED and with his restrictions to find a job in the open market. Dr. Carlton further opined that it would be reasonable for Plaintiff to undergo a surgical evaluation and that Plaintiff would benefit from a membership at an exercise gym.
45. Dr. Burch testified that Plaintiff's complaints have been consistent throughout his treatment of Plaintiff and that Plaintiff's exacerbating factor for back pain was always work activities. Dr. Burch agreed with the restrictions assigned by Dr. Welshofer. Dr. Burch further opined that even if working within these restrictions, Plaintiff may still have pain. Dr. Burch opined that the treatment he provided to Plaintiff helped give Plaintiff the ability work. Dr. Burch reviewed the job analysis for the sub-assembler position that Plaintiff was performing and opined that Plaintiff should not be performing that job with his back condition. Dr. Burch opined that his treatment for Plaintiff was directly related to Plaintiff's compensable back condition and that he had not been paid by Defendants.
46. Dr. O'Malley, opined that Plaintiff's psychological health would be best served by continuing to work in some capacity even if not on a full-time basis. Dr. O'Malley opined that Plaintiff was suffering from an adjustment disorder with mixed emotional features secondary to his pain and dysfunction. Dr. O'Malley also opined that given Plaintiff's symptoms and the deficits in *Page 14 
his education, it would be challenging for Plaintiff to find alternative work. Dr. O'Malley believed that a surgical evaluation would be reasonable for Plaintiff.
47. In order to accommodate Plaintiff's medical limitations and physical restrictions, Defendant-Employer modified the sub-assembly position given Plaintiff subsequent to his injury. This position, which was specifically modified for Plaintiff, is not a job that is readily available in the competitive employment market and therefore is not suitable. This position was specially modified for Plaintiff in that it is not a position that existed prior to Plaintiff's injury, Plaintiff was given a special stool, Plaintiff was specifically given light items to assemble, and Plaintiff was allowed much more flexibility with absences and work hours than a regular employee. Accordingly, the wages earned by Plaintiff while working in this position were not indicative of Plaintiff's wage-earning capacity.
48. The circumstances of Plaintiff's workplace incident of October 22, 2005, constituted a compensable specific traumatic incident of the work assigned that arose out of and in the course of his employment with Defendant-Employer during a judiciably cognizable time period.
49. The Full Commission finds that Plaintiff's complaints of pain are credible.
50. The Full Commission finds that Plaintiff's treatment by Dr. Burch was reasonable and necessary to effect a cure or provide relief for Plaintiff's back condition.
51. The credible medical and vocational evidence of record shows that although Plaintiff has tried to work following his injury, the jobs performed were not suitable and not indicative of Plaintiff's wage earning capacity. As a result of Plaintiff's October 22, 2005 injury, taking into account Plaintiff's physical and vocational limitations, Plaintiff has been unable to earn any wages in any employment from October 22, 2005 and continuing. *Page 15 
52. The Full Commission finds that Plaintiff would benefit from participating in vocational rehabilitation.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 22, 2005, Plaintiff sustained an admittedly compensable injury to his back as a result of a specific traumatic incident of the work assigned that arose out of and in the course of his employment with Defendant-Employer during a judiciably cognizable time period. N.C. Gen. Stat. § 97-2(6);Fish v. Steelcase, Inc.,116 N.C. App. 703, 707, 449 S.E.2d 233, 237 (1994), cert.denied, 339 N.C. 737, 454 S.E.2d 650 (1995). This compensable injury caused Plaintiff's back condition or materially accelerated or aggravated a pre-existing condition. N.C. Gen. Stat. § 97-2(6); Brown v. Family DollarDistrib. Ctr.,129 N.C. App. 361, 364, 499 S.E.2d 197, 199 (1998).
2. An employer may rebut the presumption of continuing disability through evidence "that suitable jobs are available to the employee and that the employee is capable of getting one, taking into account the employee's physical and vocational limitations." Franklin v.Broyhill Furn. Ind., 123 N.C. App. 200, 206, cert. denied,344 N.C. 629 (1996). "[M]ere proof of a return to work is insufficient to rebut the . . . presumption," because "capacity to earn is the benchmark test of disability." Kisiah v. W.R. KisiahPlumbing, 124 N.C. App. 72, 81 (1996), disc. reviewdenied, 345 N.C. 343 (1997). A "suitable" job is defined as one that the Plaintiff is capable of performing considering age, education, physical limitations, vocational skills, and experience.Burwell v. Winn-Dixie Raleigh, 114 N.C. App. 69 (1994). The sub-assembly job *Page 16 
assigned Plaintiff by Defendant-Employer subsequent to his injury, as specifically modified for him, was not proven to be readily available in the competitive labor market. N.C. Gen. Stat. § 97-32; Saums v. RaleighComm. Hosp., 346 NC 760 (1997); Peoples v. Cone MillsCorp., 316 N.C. 426 (1986). Given the foregoing, the work assigned by Defendant-Employer subsequent to his injury did not constitute suitable employment sufficient to establish capacity to earn competitive wages. Id.
3. Pursuant to Dixon v. City of Durham,128 N.C. App. 501, 495 S.E. 2d 380, (1998), the suitability of a position is not limited to a consideration of physical suitability. The "potential for advancement or . . . capacity for income growth" as well as the "similarity of the wages or salary of the pre-injury employment and the post-injury job offer" must also be considered. The sub-assembly job is not sufficiently similar in potential for advancement and salary to Plaintiff's pre-injury position to comply with the requirements of Dixon, rendering the position unsuitable. 128 N.C. App. 501, 495 S.E. 2d 380, (1998).
4. In order to meet the burden of proving disability, Plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by Plaintiff's injury.Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages *Page 17 
less than his pre-injury wages. Russell v. LowesProd. Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. In the present case, Plaintiff presented sufficient medical evidence that, taking into account Plaintiff's physical and vocational limitations, he is incapable of work in any competitive employment at this time. Id. Plaintiff unsuccessfully attempted to work for Defendant-Employer in a position that was not suitable employment. Defendants have failed to prove that there is suitable employment available to Plaintiff that Plaintiff is capable of getting, taking into account the his physical and vocational limitations. Franklin v. Broyhill Furn. Ind.,123 N.C. App. 200, 206, cert. denied, 344 N.C. 629 (1996).
6. Given the credible medical and vocational evidence of record, as a result of Plaintiff's admittedly compensable injury of October 22, 2005, Plaintiff was temporarily totally disabled and is entitled to temporary total disability compensation at the rate of $334.56 per week for the period from October 23, 2005, and continuing until Plaintiff returns to suitable employment or further order of the Commission. N.C. Gen. Stat. § 97-29; Russell v. LowesProd. Distrib., 108 N.C. App. 762 (1993).
7. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, Plaintiff is entitled to have Defendants provide all medical treatment for Plaintiff's back and chronic pain conditions, incurred or to be incurred, necessitated by the October 22, 2005 admittedly compensable injury, when bills for the same have been approved pursuant to Industrial Commission procedures. N.C. Gen. Stat. §§ 97-25; 97-25.1. This medical treatment shall include, but is not limited to, past and future chiropractic treatment by the Burch Chiropractic Center, a gym membership, and a surgical consultation. Id. Plaintiff is entitled to have Defendants provide Plaintiff with vocational *Page 18 
rehabilitation in order to assist Plaintiff in vocational training and a job search for suitable employment. Id.
8. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, Plaintiff is entitled to have Defendants provide any past and future psychiatric treatment related to the October 22, 2005 admittedly compensable injury and consequent chronic pain when bills for the same have been approved pursuant to Industrial Commission procedures. N.C. Gen. Stat. § 97-25;Workman v. Rutherford Electric Membership Corp.,170 N.C. App. 481 (2005); Toler v. Black and Decker,134 N.C. App. 695 (1999).
10. Pursuant to the stipulations of the parties, Plaintiff's average weekly wage is $501.84, which yields a weekly workers' compensation rate of $334.56. N.C. Gen. Stat. § 97-2(5).
11. Defendants are entitled to a credit for all wages paid since October 22, 2005, during which time Plaintiff was temporarily totally disabled. N.C. Gen. Stat. § 97-42; Moretz v.Richards Assocs., Inc., 316 N.C. 539, 342 S.E.2d 844 (1986).
 ***********
Based upon the foregoing Findings of Facts and Conclusions of Law, the Full Commission makes the following award:
 AWARD
1. Defendants shall pay to Plaintiff, subject to the attorney's fee approved below and the credits owed Defendant for the wages and disability compensation paid, temporary total disability compensation at a rate of $334.56 per week from October 23, 2005 and continuing until Plaintiff returns to work or further order of the Commission. To the extent that amounts have accrued, they shall be paid to Plaintiff in a lump sum. *Page 19 
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of admittedly compensable injury of October 22, 2005 compensable accident when bills for the same have been approved pursuant to Industrial Commission procedures, subject to the provisions of N.C. Gen. Stat. § 97-25.1. This medical treatment shall include, but is not limited to, past and future chiropractic treatment by the Burch Chiropractic Center, a gym membership, and a surgical consultation.
3. Defendants shall provide and Plaintiff shall participate in vocational rehabilitation.
4. Defendants shall pay all psychological treatment expenses incurred or to be incurred as a result of the admittedly compensable October 22, 2005 back injury and consequent chronic pain when bills for the same have been approved pursuant to Industrial Commission procedures, subject to the provisions of N.C. Gen. Stat. § 97-25.1.
5. A reasonable attorney fee of twenty-five percent of the compensation due Plaintiff under paragraph 1 of this Award is approved for Plaintiff's counsel and shall be paid as follows: Twenty-five percent of any lump sum due Plaintiff shall be deducted and paid directly to Plaintiff's counsel. Thereafter, Plaintiff's attorney shall receive every fourth compensation check due Plaintiff.
This the 15th day of April, 2011.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING: *Page 20 
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1